UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID LEE RIDENOUR,

    Plaintiff,

v.                                             Case No. 1:22-cv-117
                                                 Hon. Ray Kent

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant,
_____/

## OPINION

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (Commissioner) which denied his claim for supplement security income (SSI).

Plaintiff filed an application for SSI on October 31, 2018. PageID.47.[1] Plaintiff alleged a disability onset date of September 1, 2008, which he later amended to July 21, 2018. *Id*. Plaintiff identified his disabling conditions as type 1 diabetes, neck damage, neuropathy in the feet, depression, and a thyroid condition. PageID.237. Prior to applying for DIB, plaintiff completed the 12th grade and had past relevant work as a construction worker. PageID.59, 238. An administrative Law Judge (ALJ) reviewed plaintiff's application de novo and entered a written

---

[1] Plaintiff filed this case in the United States District Court for the Eastern District of Michigan. After the parties briefed the case, the court concluded that venue was improper and transferred the case to the Western District of Michigan. *See* Order (ECF No. 18). The transfer to the Western District resulted in a repetition of the "PageID." numbers. Defendants' administrative transcript is filed as a single document, ECF No. 11, which contains PageID.34 through PageID.731. An entirely new numbering system commences with the docket sheet from the Eastern District, identifying the first page of ECF No. 19-1 as "PageID.1". For that reason, the parties' briefs share the same "Page.ID" numbers as defendant's administrative transcript. To clarify this situation, the undersigned has identified citations to plaintiff's relevant brief (ECF No. 31).

1

decision denying benefits on February 4, 2020. PageID.47-61. This decision, which was later approved by the Appeals Council, has become the final decision of the Commissioner and is now before the Court for review.

## I. LEGAL STANDARD

"The federal courts review the Commissioner's factual findings for substantial evidence and give fresh review to its legal interpretations." *Taskila v. Commissioner of Social Security*, 819 F.3d 902, 903 (6th Cir. 2016). This Court's review of the Commissioner's decision is typically focused on determining whether the Commissioner's findings are supported by substantial evidence. 42 U.S.C. § 405(g); *McKnight v. Sullivan*, 927 F.2d 241 (6th Cir. 1990). "[T]he threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, -- U.S. --, 139 S. Ct. 1148, 1154 (2019). "Substantial evidence, this Court has said, is more than a mere scintilla. It means — and means only — such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (internal quotation marks and citations omitted).

A determination of substantiality of the evidence must be based upon the record taken as a whole. *Young v. Secretary of Health and Human Services*, 925 F.2d 146 (6th Cir. 1990). The scope of this review is limited to an examination of the record only. This Court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Secretary of Health & Human Services*, 889 F.2d 679, 681 (6th Cir. 1989). The fact that the record also contains evidence which would have supported a different conclusion does not undermine the Commissioner's decision so long as there is substantial support for that decision in the record. *Willbanks v. Secretary of Health & Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). "If the [Commissioner's] decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, and even if substantial evidence also supports

the opposite conclusion." *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 286 (6th Cir. 1994).

A claimant must prove that he suffers from a disability in order to be entitled to benefits. A disability is established by showing that the claimant cannot engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. *See* 20 C.F.R. §416.905; *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). In applying the above standard, the Commissioner has developed a five-step analysis:

> The Social Security Act requires the Secretary to follow a "five-step sequential process" for claims of disability. First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.

*Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001) (citations omitted).

The claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work through step four. *Jones v. Commissioner of Social Security*, 336 F.3d 469, 474 (6th Cir. 2003). However, at step five of the inquiry, "the burden shifts to the Commissioner to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Id.* If it is determined that a claimant

3

is or is not disabled at any point in the evaluation process, further review is not necessary. *Mullis v. Bowen*, 861 F.2d 991, 993 (6th Cir. 1988).

"The federal court's standard of review for SSI cases mirrors the standard applied in social security disability cases." *D'Angelo v. Commissioner of Social Security*, 475 F. Supp. 2d 716, 719 (W.D. Mich. 2007). "The proper inquiry in an application for SSI benefits is whether the plaintiff was disabled on or after her application date." *Casey v. Secretary of Health and Human Services*, 987 F.2d 1230, 1233 (6th Cir. 1993).

## II.     ALJ's DECISION

Plaintiff's claim failed at the fifth step of the evaluation. At the first step, the ALJ found that plaintiff has not engaged in substantial gainful activity since his amended onset date of July 21, 2018. PageID.49. At the second step, the ALJ found that plaintiff had severe impairments of: cervical spondylosis with disc protrusion, osteophyte complex, disc space narrowing, and foraminal stenosis; lumbar spondylosis; retained bullet fragments in pelvis; type 1 diabetes mellitus; small fiber neuropathy; obesity; major depressive disorder; bipolar disorder; and anxiety disorder. PageID.50. At the third step, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or equaled the requirements of the Listing of Impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *Id*.

The ALJ decided at the fourth step that:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except he needs a sit/stand option in which he could work in either a seated or standing position, with changes in position occurring approximately every 30 minutes. He can occasionally climb, balance, stoop, kneel, crouch, and crawl. He can occasionally reach overhead, and can frequently reach in other directions. He can frequently handle and finger. He can understand, remember, and carry out simple, routine tasks and can make simple work-related decisions. He can tolerate frequent interactions with supervisors, coworkers, and the public.

PageID.52. The ALJ also found that plaintiff is unable to perform any past relevant work. PageID.59.

At the fifth step, the ALJ determined that plaintiff could perform a significant number of unskilled jobs at the light exertional level. PageID.60-61. Specifically, the ALJ found that plaintiff could perform the requirements of unskilled, light work in the national economy such as information clerk (57,000 jobs), record clerk (42,000 jobs), and counter clerk (56,000 jobs). PageID.60. Accordingly, the ALJ determined that plaintiff has not been under a disability, as defined in the Social Security Act, from July 21, 2018 (the amended onset date) through February 4, 2020 (the date of the decision). PageID.61.

### III.  DISCUSSION

Plaintiff raised three issues on appeal.

**A.  Did the ALJ commit reversible error when she failed to consider all of the plaintiff's impairments, both severe and non-severe, at step four of the sequential evaluation process.**

When he filed this claim, plaintiff did not list chronic headaches as a condition which limited his ability to work and the ALJ did not find chronic headaches to be a severe impairment. PageID.50, 52, 237. In his first claim of error, plaintiff contends that the ALJ failed to consider his chronic headaches in determining his residual functional capacity (RFC) at step four of the sequential evaluation. Plaintiff's Brief (ECF No. 31, PageID.45-48). RFC is a medical assessment of what an individual can do in a work setting in spite of functional limitations and environmental restrictions imposed by all of his medically determinable impairments. *See* 20 C.F.R. § 416.945. In determining the RFC, the ALJ considers impairments that are both "severe" and "not severe." *Id*. A "severe impairment" is defined as an impairment or combination of impairments "which significantly limits your physical or mental ability to do basic work

5

activities." 20 C.F.R. § 416.920(c).  The ALJ is "charged with the responsibility of evaluating the medical evidence and the claimant's testimony to form an assessment of her residual functional capacity."  *Webb v. Commissioner of Social Security*, 368 F.3d 629, 633 (6th Cir. 2004) (internal quotation marks and brackets omitted).

As discussed, the ALJ found that plaintiff had a number of severe impairments. PageID.50.  Upon determining that a claimant has one severe impairment the ALJ must continue with the remaining steps in the disability evaluation. *See Maziarz v. Secretary of Health & Human Services*, 837 F.2d 240, 244 (6th Cir. 1987). Once the ALJ determines that a claimant suffers from a severe impairment, the fact that the ALJ failed to classify a separate condition as a severe impairment does not constitute reversible error. *Id*. An ALJ can consider such non-severe conditions in determining the claimant's residual functional capacity. *Id*. "The fact that some of [the claimant's] impairments were not deemed to be severe at step two is therefore legally irrelevant."  *Anthony v. Astrue*, 266 Fed. Appx. 451, 457 (6th Cir. 2008). *See Hedges v. Commissioner of Social Security*, 725 Fed. Appx. 394, 395 (6th Cir. 2018) (whether the ALJ characterized the claimant's mental-health impairments as severe or non-severe at step two was "legally irrelevant" when the claimant had severe physical impairments and the ALJ considered the limiting effects of all of the claimant's impairments, including those that were not severe, in evaluating the claimant's ability to work in step four).

Contrary to plaintiff's contention, the ALJ considered his chronic headaches in evaluating the RFC.  The ALJ noted that,

> At the hearing, the claimant testified that he was unable to work because he was in so much pain between his neck and his feet. He said he stopped working because he could not perform the heavy tasks at his concrete job anymore. . . The claimant testified to experiencing chronic neck problems. He indicated that physical therapy and traction had helped for a day or two, but he had not experienced long-term relief. <u>He reported getting headaches two or three times per</u>

6

> week, usually lasting 12 to 24 hours. He said that he had to lie down in a dark room during a headache. The claimant said his neck pain also radiated into his shoulders, and caused him to have problems with overhead activities.

PageID.52-53 (emphasis added).

Upon reviewing the medical evidence, the ALJ noted that plaintiff has had neck pain since a motor vehicle accident in the 1990's. PageID.53. More recently,

> At a visit to his primary care on October 6, 2017, the claimant complained of worsening neck pain, worse with looking up and relieved only by looking down. He also reported headaches associated with his neck pain (Exhibit B1F/35). Examination revealed full range of motion of the cervical spine (Exhibit B1F/36). The claimant underwent osteopathic manipulative treatment (OMT) and was referred to Physical Medicine and Rehabilitation for possible injections (Exhibit B1F/38).

*Id*. (emphasis added).

> The claimant began treating with Michigan State University (MSU) Physical Medicine and Rehabilitation on October 17, 2017. He reported experiencing neck pain for many years but indicated it had worsened over the past year. He stated the pain radiated up into his head, and he was having headaches three or four times per week. He denied any radicular symptoms at that time (Exhibit B1F/29). The claimant again said his pain was worse with looking up and better with looking down. He reported that OMT had been somewhat helpful, but he had not yet tried physical therapy or injections. He also reported using heat to help with his pain (Exhibit B1F/30). Upon examination, the claimant's strength, reflexes, and sensation were all intact. Cervical facet loading was positive bilaterally, and the claimant exhibited tenderness to palpation over the bilateral mid-cervical region (Exhibit B1F/32). The claimant received a right C3-6 facet injection in November 2017 (Exhibit B1F/19-22).
>
> At visits with his primary care in December 2018 and January 2019, the claimant continued to report worsening neck pain and headaches, along with some radiation of pain to his right shoulder. Examinations showed full range of motion with some pain, but good strength in both arms (Exhibit B8F/12-18).

PageID.53-54 (emphasis added).

> At a visit to the University of Michigan (U of M) Neurosurgery Clinic in February 2019, the claimant again reported neck pain that was constant when holding his head up, and only relieved by bending his neck to look straight down. He also again reported headaches. Upon examination, the claimant had full motor strength, normal sensation, normal reflexes, and normal gait and station (Exhibit

7

> B9F/23). The doctor saw no signs of compression, and indicated there was no significant stenosis on imaging. The claimant was referred to physical therapy for neck strengthening exercises (Exhibit B9F/24).

PageID.54 (emphasis added).

> The claimant attended physical therapy at Physical Therapy Services of West Michigan in April and May 2019. . . <u>After only one session, the claimant reported noticeable improvement in his pain levels and his ability to move his neck (Exhibit B13F/9, 10, 12). By May 6, 2019, the claimant reported that he was 90-95% better and was functioning with minimum pain, and he requested discharge from therapy (Exhibit B13F/13, 15-18)</u>.

*Id*. (emphasis added).

> In August and September 2019, the claimant again attempted physical therapy for his neck, this time at MSU Rehabilitation. <u>At his initial evaluation, he indicated that his pain had become much worse over the past couple of months, with frequent headaches</u>. . . . <u>By September 2019, the claimant reported feeling better overall since starting treatment</u> (Exhibit B10F/5, 10).

PageID.55 (emphasis added).

> Since this time, the claimant has continued in OMT treatment for his neck pain. In September 2019, he complained of neck and left shoulder pain, bilateral tingling in his hands, decreased grip strength, and neuropathy in his feet. He reported experiencing some improvement from his recent therapy (Exhibit B11F/15). Examination revealed normal gait and station, but did note some biomechanical findings that the doctor felt were consistent with the claimant's complaints (Exhibit B11F/17). At his next visit in October 2019, the claimant reported temporary improvement since his last visit, but unchanged symptoms overall. Objective findings were also similar to his previous visit (Exhibit B11F/11). In November 2019, the claimant continued to complain of neck pain, but indicated his symptoms were better overall, including improved range of motion and decreased pain since his last visit (Exhibit B11F/5). At his most recent visit in December 2019, the claimant reported similar symptoms and objective findings remained largely unchanged from his previous visits (Exhibit B17F/4-5).

*Id*.

After reviewing the medical record, the ALJ found that,

> [Plaintiff's] impairments prevent him from performing more than light work with a sit/stand option and additional postural and manipulative limitations. The medical record does not support the greater degree of dysfunction alleged by the claimant. The claimant's treatment for his neck pain has remained conservative, consisting

8

> of therapy, injections, and OMT therapy, from which the claimant reported at least some improvement (Exhibits B1F/30; B13F; B10F/5, 10; B11F/5). While he was seen for a neurosurgical consultation, surgery was not recommended for his neck pain, as imaging did not reveal signs of compression or significant stenosis (Exhibit B9F/23-24). <u>The claimant also has not had any significant specialized treatment for his reported headaches associated with his neck pain</u>. The record contains some objective musculoskeletal findings, but not to the extent to support any further limitations than those provided in the adopted residual functional capacity. For example, at his consultative examination, the claimant only had mild difficulty with orthopedic maneuvers, slight decreased range of motion in the cervical and lumbar spine, and slightly reduced reflexes (Exhibit B2F).

PageID.57 (emphasis added). Based on this record, the ALJ considered plaintiff's chronic headaches in developing the RFC. Accordingly, plaintiff's claim of error is denied.

### B. Is the ALJ's RFC assessment supported by substantial evidence of record.

Plaintiff has set out a series of short statements and arguments critiquing at least seven aspects of the ALJ's RFC determination: the ALJ did not analyze or allow for limitations caused by his chronic neck pain (Plaintiff's Brief (ECF No. 31, PageID.50); the ALJ did not follow Dr. Lazzara's limitations regarding "repetitive carrying, pushing, or pulling" (PageID.50-51); the ALJ did not point out her deviation from Dr. Lazzara's opinion that "Plaintiff could only occasionally squat and climb stairs with assistance" (PageID.51); the ALJ "did not fully account for the limitations related to his diabetic neuropathy with evidence of advanced small fiber neuropathy" (PageID.51); the ALJ did not adopt plaintiff's testimony that "he can only be on his feet for about five minutes, and when he was on his feet for more than a half hour, when he was still working, he was miserable for the rest of the day" (PageID.51-52); despite plaintiff's cervical, shoulder and hand impairments the ALJ's RFC "would require him to frequently handle and finger" (PageID.52); and the ALJ did not address plaintiff's "moderate limitations concerning the ability to concentrate, persist and maintain pace" expressed by DDS medical consultant Natalia Rea-Michalak, Ph.D. (PageID.52-53).

9

Plaintiff disputes most of the aspects of the RFC determination and is essentially asking this Court to perform a de novo review of the RFC. This is something the Court will not do. This Court does not review the evidence de novo, make credibility determinations or weigh the evidence. *Brainard*, 889 F.2d at 681. The issue before the Court is whether the ALJ's decision is supported by substantial evidence and legally sound. *See Taskila*, 819 F.3d at 903.

Contrary to plaintiff's contention, the ALJ addressed plaintiff's history of neck pain. *See* discussion in § III.A., *supra*. Ultimately, the ALJ found: that plaintiff's treatment for his neck pain has remained conservative consisting of therapy, injections, and OMT therapy; that plaintiff reported "at least some improvement" from the treatment; that surgery was not recommended for his neck pain; and while the medical record contains some objective musculoskeletal findings, these did not support any further limitations than those provided in the RFC. PageID.57. "It is the Commissioner's function to resolve conflicts in the medical evidence." *Craft v. Commissioner of Social Security*, 39 Fed. Appx. 274, 276 (6th Cir. 2002). The ALJ performed this function with respect to plaintiff's neck pain. Accordingly, plaintiff's claim of error will be denied.

With respect to Dr. Lazzara, the ALJ adopted some of his opinions:

> Consultative examiner R. Scott Lazzara, MD, opined that the claimant could occasionally bend, stoop, and squat; should not repetitively carry, push, and pull (but did not indicate a weight limit); and could climb stairs with assistance. He further indicated that clinical evidence did not support the need for a walking aid (Exhibit B2F). I find this opinion persuasive to the extent that Dr. Lazzara offered an opinion on specific limitations, as those limitations appear consistent with the medical evidence of objective musculoskeletal signs that are consistent with the claimant's complaints of pain. For example, the claimant's OMT Clinic records note the claimant ambulated normally, but did have some biomechanical findings that the doctor felt were consistent with his complaints (Exhibits B11F, B17F).

PageID.58. While plaintiff contends that the ALJ improperly evaluated Dr. Lazzara's opinion, he fails to set out the legal standard for evaluating a medical opinion and how the ALJ erred in

10

evaluating Dr. Lazzara's opinion. "It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997). Accordingly, this claim of error is denied.

Next, plaintiff disagrees with ALJ's findings that he is limited to "occasionally reach overhead, and frequently reach in other directions, handle and finger," and that plaintiff "needs a sit/stand option in which he could work in either a seated or standing position, with changes in position occurring approximately every 30 minutes." PageID.52. Plaintiff contends that the RFC is contrary to his neuropathy and his testimony that "he can only be on his feet for about five minutes." Plaintiff's Brief (ECF No. 31, PageID.51). Plaintiff cites no legal argument to support his claims. As discussed, the ALJ addressed these issues, pointing out that while a recent report revealed small fiber neuropathy, the medical records around this time indicated that plaintiff was in no distress and ambulating normally. PageID.57. The ALJ accounted for the neuropathy in the RFC with the sit/stand option that would allow plaintiff to get off his feet during the workday, and with a limitation of frequent handling and fingering to the extent plaintiff might have neuropathy in his hands. *Id*. In this regard, the ALJ observed that plaintiff testified to having neuropathy in his hands and "although he said he had not specifically had a doctor look at his hands yet, records note he complained of tingling and decreased grip strength at his OMT visits for neck pain." *Id*. The neuropathy-related limitations set forth in the RFC are supported by substantial evidence. Accordingly, plaintiff's claim of error is denied.

Finally, plaintiff contends that the ALJ failed to account for some of the limitations set forth in Dr. Rea-Michalak's opinions. The ALJ addressed the opinion as follows:

> DDS medical consultant Natalie Rea-Michalak, PhD, opined that the claimant had moderate limitations in the ability to understand, remember, or apply information; interact with others; and concentrate, persist, or maintain pace. She found just mild limitations in the claimant's ability to adapt or manage oneself. In

11

> assessing the claimant's mental residual functional capacity, Dr. Rea-Michalak opined that he retained the ability to perform simple work activities. She opined that he was moderately limited in interacting with the public, but did not specify a corresponding limitation, such as frequent or occasional interaction with the public (Exhibit B3A). I find Dr. Rea-Michalak's opinion persuasive, with the exception of her vague findings regarding social interaction limitations. As discussed below, Dr. Shy found just mild social interaction limitations at the psychological consultative examination; however, considering claimant's testimony that his depression makes him socially avoidant, I find that a limitation to just frequent interactions with others should accommodate the claimant's symptoms (Exhibit B2F; Hearing testimony). The remainder of Dr. Rea-Michalak's findings are supported by and consistent with the overall medical evidence, including a history of conservative mental health treatment and relatively mild mental status findings, including some depression but a full range of affect, cooperative demeanor, appropriate grooming and hygiene, and intact cognition and judgment (Exhibits B1F/5, 29; B3F; B8F/6, 18).

PageID.58-59. As with Dr. Lazzara, plaintiff did not address the legal standard for evaluating medical opinions and how the ALJ erred in evaluating Dr. Rea-Michalak's opinion. Furthermore, there is no error. The ALJ incorporated Dr. Rea-Michalak's ultimate conclusion plaintiff retained the ability to perform simple work activities, *i.e.*, "[h]e can understand, remember, and carry out simple, routine tasks and can make simple work-related decisions." PageID.52. Accordingly, plaintiff's claim of error is denied.

### C. Was the testimony of the vocational expert (VE) unreliable because of the improper hypothetical questions posed to the vocational expert and the inaccurate responses given to those hypothetical questions by the VE.

An ALJ's finding that a plaintiff possesses the capacity to perform substantial gainful activity that exists in the national economy must be supported by substantial evidence that the plaintiff has the vocational qualifications to perform specific jobs. *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 779 (6th Cir. 1987). This evidence may be produced through the testimony of a vocational expert in response to a hypothetical question which accurately

portrays the claimant's physical and mental limitations. *See Webb v. Commissioner of Social Security*, 368 F.3d 629, 632 (6th Cir. 2004); *Varley*, 820 F.2d at 779.

Here, the ALJ posed a hypothetical question to the VE reciting the limitations set forth in the RFC. PageID.122. In response, the VE identified that a person with these limitations could perform work as an information clerk, record clerk, and counter clerk. *Id*. While plaintiff's stated claim is that the ALJ posed improper hypothetical questions to the VE and that the VE gave inaccurate responses, he does not argue this issue. There was no flaw in the ALJ's hypothetical questions. The gist of plaintiff's claim is that the three jobs identified by the VE exceed his mental limitations. Specifically, while plaintiff is restricted to performing simple routine tasks and making simple routine work-related decisions, he states that according to the *Dictionary of Occupational Titles* (*DOT*), the jobs identified by the VE require math and reasoning skills which exceed his mental ability. Plaintiff's Brief (ECF No. 31, PageID.54-56).

Plaintiff does not develop this argument beyond pointing out *DOT*'s reasoning levels for the clerical positions. In this regard, plaintiff does not address the threshold legal issue of whether the *DOT* reasoning levels are binding on the ALJ. An ALJ is "within his rights to rely solely on the vocational expert's testimony," even if that testimony conflicts with the *DOT*, because "[t]he social security regulations do not require the [Commissioner] or the expert to rely on classifications in the *Dictionary of Occupational Titles*." *Conn v. Secretary of Health and Human Services*, 51 F.3d 607, 610 (6th Cir. 1995). The Sixth Circuit has concluded that the ALJ is not required to use the *DOT*'s reasoning levels:

> While the Commissioner "will take administrative notice of reliable job information available from . . . [the] Dictionary of Occupational Titles," 20 C.F.R. § 404.1566(d), "the Social Security regulations do not obligate [the ALJ and consulting vocational experts] to rely on the Dictionary's classifications." *Wright v. Massanari*, 321 F.3d 611, 616 (6th Cir. 2003) (citing *Conn v. Sec. of Health and Human Servs.*, 51 F.3d 607, 609 (6th Cir.1995)). . . [N]either the Commissioner nor

13

> the VE has an obligation to employ the DOT, and there is no precedent that requires the Commissioner to align DOT "reasoning levels" with RFC classifications. . .

*Monateri v. Commissioner of Social Security*, 436 Fed. Appx. 434, 446 (6th Cir. 2011). Here, the ALJ was entitled to rely on the VE's testimony with respect to the clerical jobs. For these reasons, plaintiff's claim of error is denied.

### IV. CONCLUSION

Accordingly, the Commissioner's decision will be **AFFIRMED**. A judgment consistent with this opinion will be issued forthwith.

Dated: March 27, 2023                         /s/ Ray Kent
                                              RAY KENT
                                              United States Magistrate Judge